Donahue, J.
The question raised by- the demurrer to the supplemental petition involves the effect of Section 11, Article XII of the Constitution, adopted on the 3d day of September, 1912, and which came into operation and effect January 1, 1913, upon the right of the city to issue these bonds in accordance with the provisions of ordinance No. 26,594, passed June 17, 1912, and that question will be considered first.
The resolution providing for submitting the question of issuing and selling these bonds, for the purpose named and in the amount named, to the qualified electors of the city of Columbus, was adopted by the city council of the city of Columbus on the 21st day of December, 1911.
On the 21st day of May, 1912, this question was submitted to the electors of the city, and there were cast at this election on the proposition in favor of issuing these bonds 14,193 votes and against the proposition 6,105 votes.
On the. 17th day of June, 1912, the city council of the city of Columbus, in accordance with the provisions of the original resolution and the vote of the electors on the proposition of issuing bonds, passed ordinance No. 26,594, authorizing an issue of bonds in the sum of $700,000 for the *332 purpose of. raising funds to pay the city’s portion of the cost of eliminating certain grade crossings named in the ordinance and resolution, in the denomination of $1,000 each and numbered from one to seven hundred, inclusive, beariñg interest at the rate , of 4 per cent, .per annum, payable semi-annually on the first days of March and September of each year, and directed the committee of finance of council to prepare, execute and sell these bonds and deposit the moneys arising therefrom in a fund to be known as “grade crossing elimination fund No. 3,” authorizing- and directing the director of public service to enter into any necessary contracts to carry out the purpose of the ordinance, and to issue his requisition upon the auditor against the fund so created to pay the consideration for the same.
On the. 3d day of August, 1912, the original petition of plaintiff was filed. Section 11 of Article XII of the Constitution went into effect on the 1st day of January, 1913. That section reads as follows: “No bonded indebtedness of the state, or any political subdivisions' thereof, shall be incurred or renewed, unless, in the legislation under which such indebtedness is incurred or renewed, provision is made for the levying and collecting annually by taxation of an amount sufficient to pay the interest on said bonds, and to provide a sinking .fund for their final redemption at maturity.”
These bonds had not in fact been issued on the first day of January, 1913, and therefore, under the provisions of Section 3950, General Code, no indebtedness was yet created nor could be created *333 until the delivery of the bonds under the contract of sale. This constitutional provision, however ■ is not directed to the issue of the bonds, but is directed to the legislation under which bonded indebtedness is incurred or renewed. If this legislation refers to the act of the general assembly of Ohio, then there was at that time and long prior thereto ample provisions for the annual levy and collection of a tax to pay the interest and provide a fund for final redemption. The following statutes would seem to cover this subject:
“Section 3953. For the payment of all bonds herein authorized, unless the interest thereon and redemption thereof is otherwise provided for, council shall levy each year during the periods the bonds have to run, a tax in addition to all levies authorized by law, sufficient to pay the interest thereon as it matures, and provide a sinking fund for their redemption at maturity.”
“Section 4506. Municipal corporations having outstanding bonds or funded debts shall, through their councils, and in addition to all other taxes authorized by law, levy and collect annually a tax upon all the real and personal property in the corporation sufficient to pay the interest and provide a sinking fund for the extinguishment of all bonds and funded debts and for the payment of all judgments final except in condemnation of property cases, and the taxes so raised shall be used for no other purpose whatever.”
“Section 4513. On or before the first Monday in May of each year, the trustees of the sinking fund shall certify to council the rate of tax necessary to provide a sinking fund for the future pay *334 ment of bonds issued by the corporation for the payment of final judgments, except in condemnation' of property cases, for the payment of interest on'bonded indebtedness, and the rents due on perpetual leaseholds of the corporation not payable from a special fund, and the expenses incident to the management of the sinking fund. The council shall place the several amounts so certified in the tax ordinance before and in preference to any other item and for the full amount certified. Such taxes shall be in addition to all other taxes authorized by law.”
“Section 5649-1. In any taxing district, the taxing authority shall levy a tax sufficient to provide for sinking fund and interest purposes.”
The schedule to the amendments to the constitution provides that all laws in force at the time the amendment shall take effect, not inconsistent therewith, shall continue in force until amended or repealed. This court has heretofore held that this would be true even in the absence of such a provision. Cass v. Dillon, 2 Ohio St., 607.
These sections of the General Code are not only not in conflict with this amendment to the constitution but in direct accord therewith, so that if the word “legislation” as used in this amendment refers to an act of the general assembly of Ohio, such legislation was then in full force and effect. On the other hand, if the word “legislation” means the resolution declaring the necessity for issuing these bonds and the ordinance passed by the city council authorizing the issuing thereof, then and iri that event this legislation had been enacted long before this amendment became a part *335 of the constitution of our state. The validity of this legislation must be determined by the constitution and laws of the state as they existed at the time such legislation is passed. The city council, in providing by resolution and ordinance for the issuing of bonds, is neither required nor permitted to anticipate changes in the constitutional or státutory law of this state. If the council was authorized to adopt this resolution when it did adopt it, if it was authorized to pass this ordinance when it did pass it, if this resolution and this ordinance were then and there a valid resolution and a valid ordinance, requiring only the action of ministerial and executive officers to carry their provisions into full force and effect, it would be idle to say that any subsequent change in the law could affect their validity or render invalid any proceedings of council that were valid at the time such proceedings were held. The fact that these officers have been delayed by this injunction suit in carrying into effect the command of the city council, expressed through an ordinance valid at the time it was enacted, cannot bring the transaction within the purview of this amendment to the constitution. These bonds, no matter when issued, are issued under the authority of a valid ordinance, and while it is true the debt is not incurred until after the bonds áre actually delivered, yet if the ordinance under which the debt is incurred, is the legislation to which this constitutional amendment refers as “the legislation,” then this ordinance, having been passed before the amendment was adopted, is not affected thereby. Nor will the bonds issued under the authority of this valid and sub *336 sisting ordinance be affected by any change in the constitution in reference thereto. There is much force in the contention of plaintiff in error that the amendment to the constitution having gone into effect prior to the delivery of the bonds no debt is yet incurred, and therefore this amendment must control, but when this amendment is closely examined it will be found that its provisions relate and are intended to relate to the legislation under which such indebtedness is incurred or renewed. The conclusion is irresistible that this constitutional amendment does not purport to invalidate any prior legislation under which bonded indebtedness has been incurred or authorized to be incurred, otherwise it would be retroactive in its nature. If, however, such a construction would obtain in this case, ■ still the supplemental petition would make no case for an injunction. This pleading avers the adoption of this amendment to the constitution, and copies it in full. It avers that the bonds have not yet been issued and the indebtedness not yet incurred. It also avers that the city council has not made any provision or passed any ordinance or resolution in compliance with the commands of this amendment, but there is no averment that the city council refuses to do this, or that it will issue these bonds, without making such provision, unless restrained by an order of this court, so that if this constitutional amendment applied to this case, there is'nothing to prevent the city council from complying with its terms before the bonds are issued.
The question of the proper construction of this constitutional amendment and its effect upon the *337 issuing of bonds is presented by the demurrer and the supplemental petition, and, in view of the necessity of an early adjudication of this question, should be disposed of at this time and in this case. Section 1 of Article II of the Constitution provides that the legislative power of this state shall be vested in the general assembly, yet in Section 8 of Article XVIII of the Constitution-is found the phrase “the legislative authority of any city or village,” so that without doubt the ordinances and resolutions passed and adopted by municipal councils are legislation in the broader and more comprehensive meaning of that term, and if it were not for the fact that other political subdivisions of the state are authorized to issue bonds, there would be little difficulty in determining the meaning of this language as here used. It is unfortunate that the framers of this amendment did not use language that would make the meaning clear beyond any dispute or controversy and alike applicable to all authorities proposing to issue bonds, for while the ordinances of city councils may well come within the definition of legislation, yet county commissioners, boards of education and other local authorities are authorized to issue bonds, and these boards are not legislative bodies in any sense of the word. Nor would any resolution adopted by either of these boards ordinarily be classed as legislation, yet in the last analysis the resolution of a board of county commissioners or a board of education, authorizing the issuing of bonds or the refunding of a bonded indebtedness, is the immediate authority under which the indebtedness is *338 incurred or renewed, whether such resolution may be called legislation or not.
In view of the fact, however, that, at the time this amendment was adopted and went into effect, there was legislation by the general assembly of Ohio in harmony with its provision, it would seem that something other and further than this legislation was intended. These boards are authorized and required by law to levy and collect annually by taxation an amount sufficient to pay the interest on bonds and to provide a fund for their final redemption, and, therefore, it would appear that this amendment to the constitution was framed and adopted for the purpose of requiring not only the legislature of the state but the taxing authority of any political subdivision of the state proposing to issue bonds to include in the law, resolution or ordinance, under which such indebtedness is incurred or renewed, the provision for levying and collecting annually by taxation an amount sufficient to pay the interest and retire the bonds, otherwise the only effect of this amendment would be to carry into the organic law of the state the existing statutory provisions. In many instances this is a wise and proper thing to do, for it at once removes an important public policy from the realms of uncertainty and no longer permits it to become the battledore and shuttlecock of legislative fancy. However that may be, this provision of the constitution must be held to serve some substantial purpose, and to the end that the will of the people may not be defeated by too narrow an interpretation of its terms, we have reached the conclusion that, in obedience to this amendment to the consti *339 tution the taxing officials of any political subdivision of the state must provide in the resolution or ordinance authorizing such issue, or in a resolution or ordinance in relation to the same subject-matter passed prior to the issuing of such bonds, for levying and collecting annually by taxation an amount sufficient to pay the interest thereon and provide a sinking fund for their final redemption at maturity. This, of course, does not require the immediate levying of a tax certain, either in amount or rate, for the provision of this amendment is that this tax shall be levied annually and collected annually, but it does mean that, at the time the issue of bonds is authorized, the taxing authorities proposing to issue such bonds shall provide that a levy shall be made each year thereafter during the term of the bonds in an amount sufficient to pay the interest thereon and retire the bonds, and such provision, so made at the time the bonds are authorized, shall be binding and obligatory upon these taxing officers of that political subdivision and their successors in office until the purpose of such levy shall have been fully accomplished by the retirement of the bonds so issued. Such a provision fills the full purpose of this amendment to the constitution and is not subject to the objection that it is impossible at the time of issue to determine either the amount that must be raised for that purpose or the rate that must be levied to raise such an amount. That amount may be determined from year to year, and levied annually, for that is the command of the amendment itself; but having declared at the time of the issue of such bonds that a levy shall be *340 made in an amount sufficient, there then remains for the taxing officials the mere matter of calculation as to the amount. The levy must be made at all events in pursuance to the original provisions therefor, and subsequent taxing authorities must make such annual levy, regardless of what exigencies may arise in the future.
Another very important question in this case is presented by the amended petition and demurrer thereto. There can be no doubt of plaintiff’s right to bring this suit. Under the provisions of Section 4311, General Code, the solicitor is authorized to bring an action to enjoin or restrain a misapplication of funds of the corporation, or the abuse of its corporate powers, or the execution or performance of any contract made in behalf of the corporation in contravention of the laws and ordinances governing it, or which was procured by fraud or corruption. Where the city solicitor fails, upon written request of any taxpayer of the corporation, to bring such suit, the taxpayer may institute an action in his own name, on behalf of the corporation, under the provisions of Section 4314, General Code. It was held by this court in the case of The Elyria Gas & Water Co. v. City of Elyria, 57 Ohio St., 374, that “Where the proceedings of a municipal corporation are unauthorized and void, either for want of power or its unlawful exercise, and are designed to raise a fund by the sale of its bonds or by taxation to be applied to the object contemplated by the proceedings, a suit to enjoin them may be brought by a taxpayer, under Sections 1777, 1778, of the Revised Statutes, without waiting until the fund is *341 raised ready for expenditure. The abuse of corporate powers, within the purview of Section 1777, includes the unlawful exercise of powers possessed by the corporation, as well as the assumption of power not conferred.” Section 1777, Revised Statutes, is now Section 4311, General Code.
Notwithstanding the right of the taxpayer to maintain this suit it by no means follows that the election at which the question of issuing the bonds was submitted, to the electors of this city can be contested in this action. Since the submission of this case counsel on request of the court have furnished additional briefs covering this question. There is no claim made in the petition that this election was unauthorized and therefore void. It is admitted that by resolution of council this proposition to issue bonds was properly submitted to the electors of this city. In the case of Gas & Water Co. v. Elyria, supra, the right to injunction was predicated upon an averment in the petition that the resolution of council declaring it to be necessary to issue and sell bonds, and providing for the submission of the question of their issue to the electors, was improperly passed, and for that reason the action of council in that behalf was invalid and the election held thereunder a nullity. In such a case, of course, the court had the right to determine whether or not an election was authorized by law. If there was no lawful authority for holding the election, then there was no lawful election, and nothing to be contested. In such a case the election officers would not have jurisdiction to ascertain and declare the result of the election, and their certificate thereof would *342 be binding upon no one. This case, however, presents no such question. The petition does not challenge the authority to hold the election under the resolution of council, but, on the contrary, challenges the conduct of the election itself. It was held by this court in the case of Peck v. Weddell, 17 Ohio St., 271, “That allegations of fraud and illegality in conducting the election, constitute no sufficient ground for injunction. Wrongs of such a nature can be inquired into and redressed, only by means of a contest of the election.” That action was to enjoin the defendant as clerk of the common pleas court of Wood county from recording the abstract of the vote in that county upon the question of the removal of the county seat from Perrysburg to Bowling Green. In disposing of the case, Scott, J., said: “It is evident that this mode of inquiring into alleged frauds in elections, and of ascertaining the will of the majority of the electors, as expressed by the legal ballots, would be very illy adapted to accomplish the end proposed, and would be as likely to facilitate the perpetration, as the correction, of frauds against the public.”
In the case of The State, ex rel. Ingerson, v. Berry, 14 Ohio St., 315, the relator sought a peremptory writ of mandamus directed to the clerk of the court of common pleas of Wyandot county, directing him to count certain returns which were alleged to have been improperly excluded by him, and directing him to declare the relator elected to the office of sheriff. The court in its opinion, on page 323, said: “The importance, in a government like ours of preserving the purity of elec *343 tions, and of ascertaining truly, and rendering effective, the will of the people as fairly expressed through the ballot-boxes, needs no comment. In the accomplishment of these purposes, the right of contesting all elections, is perhaps the most efficient agency provided by law. The duty of making such provision is solemnly enjoined upon the legislature, by the constitution of our state. * * * This controlling policy may not be nullified by the courts of this state, but should be protected and cherished with the same sedulous care that the constitution and laws evince.”
There are a few cases from other states in which it is held that a court of equity has jurisdiction in election-contest cases, even though no express jurisdiction is conferred, but these are confined almost entirely to cases where some constitutional provision is claimed to have been violated by the election under consideration, and in such cases it is held that the constitutions of these states confer jurisdiction by implication upon courts of chancery to protect and preserve the constitution of the state. It is clear, however, the constitution of Ohio not only does not confer such jurisdiction by implication but in express terms provides that the general assembly of the state shall determine before what authority and in what manner the trial of contested elections shall be conducted.
All the authorities seem to be in accord upon the proposition that elections belong to the political branch of the government and are beyond the control of the judicial power, and that courts have no inherent power to try contested elections and have never exercised such power, except where it *344 has been conferred by express enactment or necessary implication. In the case of Moulton v. Reed, 54 Ala., 320, it was held that “Where a public officer is charged by law with the duty of ascertaining and declaring the result of an election, and issuing a certificate of election to the person elected, such certificate is conclusive evidence of the result and of the right of such person to the office; except when statutes authorize a contest, and it is commenced, or in quo warranto, or information in the nature thereof, to determine the right to the office, when the certificate is prima facie evidence, imposing the burden of proof on him who assails it.”
In the case of Dickey et al. v. Reed et al., 78 Ill., 261, it was held: “Courts of equity have no inherent power to try contested elections, and they have never exercised such power, except in cases where it has been conferred by express enactment or necessary implication therefrom.”
In the same case it was held: “A writ of injunction, issued in a matter where the court could not, under any circumstances, have power to hear, determine and decree in reference to such matter, is coram non judice, and void.”
In the case of Hamilton v. Carroll, 82 Md., 326, it was held: “A court of equity has no jurisdiction to determine an election contest of any kind.” This was an action for an injunction to restrain the issuing of bonds for the purpose of building a court house and jail at La Plata in pursuance of an election for the change of a county seat of Charles county, Maryland.
*345 In the case of The State, ex rel. v. Dubuclet, 28 La. An., 698, it was held that the courts cannot go into the business of inquiring into the qualification of voters or the correction of poll books, and like questions, without some constitutional authority, constitutional statute or warrant giving them jurisdiction.
In the case of The State, ex rel., v. Dortsch, 41 La. An., 846, it was held that “In the absence of special statutory authorization, courts are without jurisdiction ratione materiae to entertain cases of contested elections. The foregoing rule applies as well to elections held to determine the location of a parish seat as to the election of officers. No statute invests the courts of this state with jurisdiction over contested elections to determine the parish seat.”
The same proposition .of law was announced in the cases of the Construction Co. v. Police Jury, 44 La. An., 863, and Fowler v. Gable, 3 Pa. Dist., 23. In the case of Parmeter v. Bourne, 8 Wash., 45, it was said: “The superior court has no jurisdiction of the subject-matter of an action which seeks to enjoin the removal of a county seat on the ground of fraud committed in the election therefor.”
In this state the constitution itself would seem to settle this controversy. Section 1 of Article IV of the Constitution vests the judicial power of the state in the several courts named in that section, and such other courts as from time to time may be established by law. If elections come within the term “judicial power,” then, of course, courts have jurisdiction without reference to *346 whether there is any further provision of the constitution or statutory law of the state conferring such authority; but the constitution of our state also specifically provides in Section 21 of Article II that “The general assembly shall determine, by law, before what authority, and in what manner, the trial of contested elections shall be conducted.” This provision strongly emphasizes the fact that in this state elections do not come within the judicial power conferred by Section 1 of Article IV of the Constitution, otherwise this earlier provision of the constitution could not be operative and the general assembly of the state would be compelled to commit this question to the courts. But it has done nothing of the kind. Acting upon this provision of the constitution and recognizing that the framers of the constitution, and the people of the state when they adopted it, recognized that elections belonged to the political branch of the government, and are, therefore, not within the meaning of the phrase “judicial power,” it has provided for contests of elections in various ways and before various authorities other than the courts of the state. For instance, the contest of an election of an elector of the president of the United States shall be heard before a commission consisting of the governor and four judges of the circuit courts, to be appointed by the governor, the judgment of this commission to be final. The senate and house of representatives are authorized, respectively, to hear and determine any contest of the election of members. The contest of an election of a justice of the peace must be heard by three freeholders appointed by the judge of the probate court, and *347 wherever the statute provides that a court shall hear and determine a contest of election procedure is provided for the conduct of such contests other than that provided for the hearing and determining of questions judicial in their nature.
The right of the general assembly to confer .authority upon these various officers, commissioners, the house of representatives and senate, has never been questioned in Ohio, except in the case of The State, ex rel., v. Harmon, 31 Ohio St., 250, in which case it was held in the first paragraph of the syllabus that “The authority conferred on the senate to try contested - elections is not judicial power within the meaning of Section 1 of Article IV of the Constitution, which requires the judiciál power of the state to be vested in the courts.”
Our attention has not been called to any other case in this state where this question has been directly made, yet there are many reported cases sustaining laws providing for the contest of an election before nonjudicial officers, and the authorities from other states are all to the same effect.
Paine on Elections, Section 793, says: “In the absence of constitutional inhibitions, the legislature has power to declare the certificate of election conclusive, in all cases. It may or may not authorize a contest. If a contest be authorized, the mode of contest and of trial will rest absolutely in the legislative discretion. , * * * The right to contest an election is not a vested right.”
If the contest of an election were' included in the term “judicial power of the state,” then all this legislation conferring authority on other than *348 the courts to hear and determine contested elections would be in violation of Section 1, Article IV of the Constitution. If it is not judicial power, then the courts have no inherent authority to hear and determine such questions as are presented by this petition, and in the absence of any constitutional or statutory provision conferring this power, the certificate of the election officers is just as binding upon the courts as it is upon any other officer or citizen of the state. Section 12303, General Code, does confer jurisdiction on the courts in an action in quo warranto brought against a person who usurps, intrudes into, or unlawfully holds or exercises, a public office, civil or military, to inquire into the validity and legality of the election under which the defendant claims to hold his office. This proceeding in quo warranto was the only remedy in the nature of a contest of an election known to the common law, and in the absence of a statute providing before what authority and in what manner the trial of contested elections shall be conducted, this writ may be resorted to for that purpose, but it must be limited to the provisions of Section 12303, General Code, for that is now the only authority in Ohio for bringing an action in quo warranto. State, ex rel., v. Hunt, 84 Ohio St., 143.
Where, however, the legislature has provided a statutory proceeding for contesting an election that proceeding must be followed. The State, ex rel., v. Patterson, 84 Ohio St., 89-100; The State, ex rel., v. Marlow, 15 Ohio St., 114; Peck v. Weddell, 17 Ohio St., 271; The State, ex rel. Ingerson, v. Berry, 14 Ohio St., 315.
*349 The great weight of authority in other states is to the same effect, but it is held in some states that these remedies are cumulative. This holding, however, is based upon the language of the constitutional provisions in those states. The question, nevertheless, is settled in Ohio by the cases above cited.
The constitution of our state enjoins upon the general assembly the duty of determining' by law before what authority and in what manner the trial of contested elections shall be conductéd. The presumption is that the general assembly has done its duty. Whether it has performed its duty in that behalf or not, is of no importance in this case. If it has provided means for contesting an election of this character, then the means so provided afford the only relief available. If it has failed to provide before what authority and in Avhat manner the trial of a contest of an election, such as this, shall be conducted, that failure confers no jurisdiction upon the courts, where none is conferred by the constitution or the statutes of the state, and particularly where the constitution specifically excepts contest of elections from the general grant of judicial powers. It has been suggested that a court of equity having jurisdiction of the case, this question of the contest of an election is merely incident thereto, and that, therefore, the court will dispose of all the questions presented. This petition presents no question of purely equitable cognizance. In fact, the case presented by the petition is a case of contest of an election. The only issue tendered by the petition is the irregularities and illegali *350 ties in the conduct of this election, and while the prayer is for equitable relief, the right to such relief is predicated upon the determination of the contest of the election sought to be had in this way. The fact that the prayer is for equitable relief does not change the nature of the action, and it would be altogether absurd to say that a court of equity acquires jurisdiction over a subject-matter which is not equitable in its nature on the theory that these questions are merely incident to the suit, when in fact it is the only question in controversy, and the equitable relief ■prayed for is merely incident to the determination of these questions. If the general assembly has neglected its duty in providing a means for contesting an election of this character, that neglect will not justify a court in the assumption of power that it does not possess. Two wrongs will not make a right. If it has provided for such a contest, then the method so provided is exclusive.
It has been suggested that the general assembly has provided for a contest of an election of this character. That claim is based upon the fact that Section 3945, General Code, provides that elections of this kind must be conducted in the same manner as elections of municipal officers. The statutes relating to elections of municipal officers provide how and before what authority a contested election may be had, but an inspection of Section 5169, General Code, does not seem to this court to justify the conclusion that that section authorizes the contest of an election of this character in the manner therein provided. Whether it does or not is of no importance in the disposi *351 tion of this case. In either event the court has' no jurisdiction. It follows, therefore, that the judgment of the circuit court must be affirmed.

Judgment affirmed.

Nichols, C. J., Johnson, Wanamaker, Newman and Wilkin, JJ., concur.